**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

KIMBERLY PARKER,                    )
                                    )
                    Plaintiff,      )
                                    )
        v.                          )        Civil Action No. 22-384-GBW-CJB
                                    )
KILOLO KIJAKAZI,                    )
Acting Commissioner of Social Security,  )
                                    )
                    Defendant.      )
                                    )

**<u>REPORT & RECOMMENDATION</u>**

Plaintiff Kimberly Parker ("Plaintiff"), appeals from a decision of Defendant Kilolo

Kijakazi, the Acting Commissioner of Social Security ("the Commissioner" or "Defendant"),

denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the

Social Security Act ("SSA") and supplemental security income ("SSI") benefits under Title XVI

of the SSA.  *See* 42 U.S.C. §§ 401-33 & 1381-1383f.  The Court has jurisdiction over the matter

pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by

Plaintiff and the Commissioner (the "motions").  (D.I. 16; D.I. 22)  Plaintiff asks the Court to

reverse the Commissioner's decision with an instruction that benefits be awarded or that the case

be remanded for further proceedings.  (D.I. 17 at 20)  The Commissioner opposes that request

and asks that the Court affirm her decision.  (D.I. 23 at 12)  For the reasons set forth below, the

Court recommends that the District Court GRANT-IN-PART and DENY-IN-PART Plaintiff's

motion for summary judgment and GRANT-IN-PART and DENY-IN-PART Defendant's

motion for summary judgment.

**I.      BACKGROUND**

## A.      Procedural Background

On July 10, 2018, Plaintiff filed for DIB and SSI benefits; she alleged disability

beginning on April 25, 2018.  (D.I. 12 (hereinafter "Tr") at 174-75, 180)  Plaintiff's claim was

denied initially and then again upon reconsideration.  (*Id.* at 92-112)  Plaintiff next filed a request

for an administrative hearing.  (*Id.* at 115-16)  On August 13, 2020, a hearing was held before an

Administrative Law Judge ("ALJ"), at which Plaintiff was represented by counsel.  (*Id.* at 34-65)

On September 23, 2020, the ALJ issued a decision denying Plaintiff's request for

benefits.  (*Id.* at 15-27)  Plaintiff requested review of the ALJ's decision by the Appeals Council,

and the Appeals Council ultimately denied Plaintiff's appeal.  (*Id.* at 1-4)  Thus, the ALJ's

decision became the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.955 & 404.981;

*Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

On March 24, 2022, Plaintiff filed a Complaint in this Court seeking judicial review of

the ALJ's decision.  (D.I. 2)  On August 30, 2022, Plaintiff filed her motion for summary

judgment.  (D.I. 16)  The Commissioner opposed Plaintiff's motion and filed a cross-motion for

summary judgment on September 30, 2022, (D.I. 22), and briefing was completed on October

15, 2022, (D.I. 24).[1]

## B.      Factual Background

### 1.      Plaintiff's Medical History, Conditions and Treatment

Plaintiff alleges that she has been disabled and unable to work due to various medical

conditions.  Relevant evidence of record regarding those conditions is set out below.

---

[1]      On September 16, 2022, United States District Judge Gregory B. Williams
referred this case to the Court to hear and resolve all pretrial matters, including the resolution of
case dispositive motions.  (D.I. 18)

### a.      Physical Conditions

Plaintiff alleges that she suffers from many different physical conditions, including:  a right ankle/foot injury leading to reflex sympathetic dystrophy ("RSD")[2] and neuropathy, fatigue, headaches, fibromyalgia, osteoarthritis, neck and back pain, ocular migraines, thoracic outlet syndrome, and cervical radiculopathy.  (Tr. at 48, 208, 250)  On appeal, Plaintiff's arguments regarding her physical conditions largely focus on the ALJ's treatment of her right ankle/foot condition and RSD (together, "right ankle/foot conditions," "right ankle/foot impairments" or "right ankle/foot limitations"), as well as her chronic pain.  Thus, and given Plaintiff's lengthy medical history, the Court will herein focus on facts related to those conditions.

In March 2016, Plaintiff sustained a fracture of her right heel and ankle in a car accident, which has resulted in ongoing chronic pain.  (*Id.* at 47, 556)  Plaintiff's records indicate that she was treated by Dr. Drew Brady of First State Orthopaedics from 2017 to 2019 with respect to this issue.  (*Id.* at 556-71, 1060-66)

On May 15, 2017, for example, Plaintiff was seen by Dr. Brady, who noted that Plaintiff was only working six-hour shifts and was unable to work more than that due to the pain.  (*Id.* at 556)  Dr. Brady performed a right ankle joint injection of Kenalog 40 mg and lidocaine 1% for the pain.  (*Id.*)  He recommended that Plaintiff temporarily be limited to six hours of work per day on her feet "as this is aggravating her posttraumatic arthrosis of the subtalar joint."  (*Id.*; *see also id.* at 560)

---

[2]      RSD is a term used to describe a chronic condition characterized by severe burning pain, often involving one of the extremities.  (D.I. 17 at 6 n.3)

Plaintiff saw Dr. Brady for a follow-up on July 30, 2018.  It was noted that Plaintiff's right ankle problem was then "stable[.]"  (*Id.* at 558)  Plaintiff described her symptoms as "moderate" but noted that the pain is "aching and sharp" and that it is "aggravated by movement and walking."  (*Id.*)  Dr. Brady "suspect[ed] that [Plaintiff was] having a stress response at the medial tibia[,]" and he recommended that she walk with a cane and use topical over-the-counter pain medications.  (*Id.*)  An x-ray showed moderate subtalar arthrosis (a type of arthritis) with narrowing of the posterior talocalcaneal joint.  (*Id.*)

On June 4, 2019, Plaintiff had a follow-up visit with Dr. Brady.  She noted that her "symptoms occur constantly with intermittent worsening[,]" and that the overall "problem is worse."  (*Id.* at 1063)  Plaintiff described the ankle/foot pain she experiences as "shooting, sharp and piercing[,]" and said that the symptoms are "aggravated by standing and walking[.]"  (*Id.*)  She also explained that she was experiencing "tingling and numbness[.]"  (*Id.*)  Although Plaintiff reported having "great flexibility in the ankle[,]" she noted that it was very painful. (*Id.*)  After evaluating Plaintiff, Dr. Brady concluded that her medial malleolus (back of the tibia) and calcaneal (heel bone) fractures had healed, and that he was not sure if there were any other orthopedic surgery options that could make her better.  (*Id.* at 1063-64)  But he recommended that she consult with a neurologist to see if the continuing issues she was experiencing were related to her nerves.  (*Id.*)

On November 12, 2019, Plaintiff consulted with Dr. Bruce Grossinger, a neurologist. (*Id.* at 1625)  Upon examination, Dr. Grossinger noted that Plaintiff was "slow to arise from a chair and she walks with a limp favoring her right foot and ankle and her left hip[.]"  (*Id.*)  He also noted that she "has tenderness in her right foot and ankle[,]" has "definite weakness in the lower extremities[,]" and has "decreased Achilles reflexes[.]"  (*Id.* at 1624-25)  Given these

4

findings, Dr. Grossinger ultimately diagnosed Plaintiff with, *inter alia*, chronic right foot and ankle dysfunction and chronic pain syndrome.  (*Id.* at 1625)

On November 26, 2019, Plaintiff underwent electromyography ("EMG") testing of her upper and lower extremities with Dr. Grossinger.  (*Id.* at 1617-23)  The EMG of the lower extremities showed "moderate right S1 radiculopathy[.]"  (*Id.* at 1621)  After the testing, Dr. Grossinger reviewed the results and concluded, among other things, that Plaintiff had symptoms consistent with residual orthopedic damage of the right foot consistent with RSD.  (*Id.* at 1615)  During his exam, he noted allodynia and hyperpathia, which were also "in keeping with RSD." (*Id.*)

On March 3, 2020, Plaintiff had a follow-up appointment with Dr. Grossinger regarding, among other things, her RSD.  (*Id.* at 1613)  Upon examination, Dr. Grossinger noted that Plaintiff had "allodynia and weakness of the right foot and ankle with severe pain associated with touch over the right lower extremity."  (*Id.*)  He also noted that she had an "antalgic" gait (i.e., an altered pattern of walking, due to a limp).  (*Id.*)

### b.  Mental Health Conditions

Plaintiff alleges that she suffers from the following mental health conditions:  post-traumatic stress disorder, depression, anxiety disorder, and mood disorder due to a physiological condition.  (*Id.* at 208, 250, 1414)

Plaintiff has a lengthy treatment history with Cynthia Wright, LPCMH ("Wright") of Mid-Atlantic Behavioral Health, related to Plaintiff's various mental health conditions.  During weekly sessions with Wright in 2018, Plaintiff reported pain levels that sometimes complicated her mental well-being, including interfering with life activities and her ability to manage stress. (*See e.g.*, *id.* at 601, 608, 611, 616, 619, 622, 967, 978, 984, 1016)  Records indicate that Plaintiff

often appeared anxious, tense, depressed, gloomy, irritable, fatigued, and/or negative in these sessions, although her feelings of anxiety and depression tended to fluctuate over time, along with the manifestations of her mental health conditions (e.g., difficulty concentrating, difficulties with activities of daily living, and feelings of hopelessness).  (*See, e.g.*, *id.* at 592-93, 598-600, 614-15, 623, 625, 963-966, 973, 975-977, 981, 983, 1001, 1006, 1010, 1014, 1018)

From January 2019 to April 2019, Plaintiff continued to see Wright weekly, experiencing some temporary improvement in her mental health symptoms.  (*See, e.g.*, *id.* at 1028, 1032, 1036, 1040, 1048, 1052, 1420, 1424, 1428, 1440, 1444, 1452)  During this period, Plaintiff would sometimes exhibit negative signs, including a tense and anxious or depressed mood; however, at other times, she was observed as happy or cautiously hopeful.  (*Id.* at 1029, 1034, 1038, 1054, 1058, 1421, 1426, 1434, 1446, 1450)  Around June 2019, Plaintiff began to report worsening chronic body pain and weakness, (*id.* at 1476), and her records indicate that these symptoms generally worsened until around June 2020, (*see, e.g.*, *id.* at 1480, 1484, 1488, 1492, 1500, 1504, 1508, 1512, 1520, 1524, 1528, 1532, 1536, 1544, 1552, 1556, 1580, 1584, 1588, 1592, 1596, 1600, 1608).

### 2.     The Administrative Hearing

At the administrative hearing held on August 13, 2020, the ALJ heard Plaintiff's testimony and that of Charlotte Dixon, an impartial Vocational Expert ("VE").  (*Id.* at 34-35)

### a.     Plaintiff's Testimony

Plaintiff began by discussing some of her relevant past work experience.  First, she explained that she had worked as a certified nursing assistant at No Place Like Home.  (*Id.* at 42-43)  She testified that she helped take care of patients in their homes, including bathing and feeding patients along with doing some light housework for them.  (*Id.* at 43)  Plaintiff also

6

worked at Wawa from 2013 to 2018, where she had many responsibilities, including "putting away orders, stocking things, making sandwiches, working the line, [and] running the register." (*Id.* at 40, 44)  Once she was promoted to food service manager, her responsibilities increased, including ordering inventory, managing the store in the absence of the general manager, and checking orders and deposits.  (*Id.* at 44)  Plaintiff's work at Wawa also included picking up and carrying products, some of which were heavy; she testified that she helped to stock the cold box and deli, and she also helped carry paper products.  (*Id.*)

Plaintiff then began to discuss her health issues and their impact on her ability to work. With regard to her right foot and ankle, Plaintiff testified that she was in a car accident that had "completely crushed" her right foot.  (*Id.* at 47)  As a result of that injury, Plaintiff explained that she is in "constant pain[,]" including feelings of numbness, burning and throbbing.  (*Id.* at 47-48) She testified that this pain often "is excruciating" when she steps down and that it will sometimes "shoot[] right through [her leg]" and cause her to fall.  (*Id.* at 48)  She explained that her orthopedic doctor suspected that she might be experiencing a nerve-related issue, and that her neurologist, Dr. Grossinger confirmed that this was the case, diagnosing her with neuropathy and RSD.  (*Id.*)  As a result of her pain, Plaintiff testified that she has trouble walking and standing. (*Id.* at 48-49)  As to walking, Plaintiff said she can only go a short distance if she goes very slowly, but if the ground is uneven and she steps down the wrong way, the pain might cause her to fall.  (*Id.*)  As to standing, she said she cannot stand straight because it "put[s] more pressure on that outside part [of her ankle] that sends all that burning" pain throughout her foot and ankle. (*Id.* at 49)

Plaintiff next discussed her mental health conditions, including her mood disorder with a physiological condition.  For instance, in discussing the pain associated with her fibromyalgia,

Plaintiff testified that her pain can last much longer if she "let[s] the mood part of it keep it" because "once you start feeling like that, then it[ is] just hard to not let the mind part take over and say just give up[.]"  (*Id.* at 51)  She also testified that her conditions, including her pain, affect her overall ability to focus and concentrate.  (*Id.* at 53)  Specifically, Plaintiff testified that she can tell that her thought process has changed from the fatigue and the pain, and that she is more forgetful than she used to be.  (*Id.*)

Plaintiff concluded her testimony by stating that she did not feel like she was able to engage in full-time work.  (*Id.* at 59)  Specifically, she testified that she did not believe she was capable due to the various accommodations she has to make for herself depending on what her body is feeling each day.  (*Id.*)  For instance, she noted that some days she can only walk for 10 minutes before taking a break for an hour, and such accommodations are "not conducive to any work environment that [she has] ever been in[.]"  (*Id.*)

### b.      Vocational Expert's Testimony

VE Dixon also testified at the hearing.  She explained that she was aware of Plaintiff's previous jobs.  (*Id.* at 60-61)  She stated that Plaintiff's work at No Place Like Home would be considered work as a "Home Attendant[;]" this job is typically performed at a medium exertional level, but based on Plaintiff's testimony, she performed it at a heavy exertional level.  (*Id.*) Work as a Home Attendant is semi-skilled with a Skilled Vocational Preparation ("SVP") Level 3.  (*Id.* at 61)  Plaintiff's experience at Wawa would be considered skilled work as a "Retail Manager[;]" this work would be classified as requiring a light exertional level and was an SVP 7. (*Id.*)

Next, the ALJ gave the VE a hypothetical:

> [A]ssume a hypothetical individual that could perform a restricted
> range of light[ work].  In addition to the normal lifting, standing,
> walking, and sitting restrictions that are accommodated with a light
> RFC, I'm adding the following additional limitations of being able
> to frequently climb ramps and stairs; occasionally climb ladders,
> ropes, and scaffolds; occasionally balance; frequently stoop;
> occasionally kneel, crouch, and crawl; could tolerate frequent
> exposure to vibration, hazards; can remember, understand, and
> carry out simple instructions; can tolerate occasional changes in
> the workplace; and can tolerate occasional interaction with
> supervisors.  Based on those limitations, could this hypothetical
> individual perform any of [Plaintiff's] past work?

(*Id.*)  The VE considered these limitations and noted that such an individual would not be able to perform Plaintiff's past work.  (*Id.*)  The VE noted, however, that there were other jobs in the national economy that the hypothetical individual could do, including:  (1) Merchandise Marker, (2) Routing Clerk, and (3) Order Caller.  (*Id.* at 62)

Plaintiff's counsel also questioned the VE.  Counsel asked "if you had a hypothetical individual who, due to their pain and fatigue, was going to be off-task during the eight[-]hour work day 15% of the time, how does that affect their ability to sustain work?"  (*Id*. at 63)  The VE responded that an individual who was off-task 11% or more of their time would be precluded from work.  (*Id.*)  Counsel then asked whether an individual who misses two days per month or more would be excluded from work, to which the VE testified that that was correct.  (*Id.* at 63-64)  Finally, Counsel asked "if you had a hypothetical individual who was going to require a[n] unscheduled break on top of regularly scheduled breaks every hour to . . . stand[ and] walk around[,] and this would be occurring, say, about . . . 10 minutes each hour, and they would be off-task in that break, how would that affect their ability to . . . sustain work?"  (*Id.*)  The VE concluded that such an individual would be precluded from work because "[u]nscheduled work breaks that frequent and that long would not be tolerated and would preclude employment."  (*Id.*)

9

### 3.    The ALJ's Findings

On September 23, 2020, the ALJ issued his decision, which included the following 11

findings:

> 1.  The claimant meets the insured status requirements of the
> Social Security Act through September 30, 2020.
>
> 2.  The claimant has not engaged in substantial gainful activity
> since March 25, 2018, the alleged onset date (20 CFR 404.1571 et
> seq., and 416.971 et seq.).[3]
>
> 3.  The claimant has the following severe impairments: cervical
> degenerative disc disease ["cervical DDD"]; obesity; generalized
> anxiety disorder; post-traumatic stress disorder (PTSD); and major
> depressive disorder (20 CFR 404.1520(c) and 416.920(c)).
>
> 4.  The claimant does not have an impairment or combination of
> impairments that meets or medically equals the severity of one of
> the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1
> (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925
> and 416.926).
>
> 5.  After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform light work as defined in 20 CFR 404.1567(b) and
> 416.967(b) except can frequently climb ramps and stairs;
> occasionally climb ladders, ropes, and scaffolds; occasionally
> balance; frequently stoop; occasionally kneel, crouch and crawl;
> can tolerate frequent exposure to vibration and hazards; can
> remember, understand and carry out simple instructions; can
> tolerate occasional changes in the work place; and can tolerate
> occasional interaction with supervisors.
>
> 6.  The claimant is unable to perform any past relevant work (20
> CFR 404.1565 and 416.965).
>
> 7.  The claimant was born on February 4, 1969 and was 49 years
> old, which is defined as a younger individual age 18-49, on the
> alleged disability onset date. The claimant subsequently changed

---

[3]    As noted above, it appears that Plaintiff actually alleged disability beginning on
April 25, 2018, not March 25, 2018.  (Tr. at 174-75, 180)  The difference is immaterial for our
purposes here.

age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from March 25, 2018, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(*Id.* at 17-27 (emphasis omitted))

## II.    STANDARD OF REVIEW

### A.    Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In determining the appropriateness of summary judgment, the Court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party' but not weighing the evidence or making credibility determinations."  *Hill v. City of Scranton*, 411 F.3d 118, 124-25 (3d Cir. 2005) (alteration in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

### B.    Review of the ALJ's Findings

The Court must uphold the Commissioner's factual findings if they are supported by "substantial evidence." *See* 42 U.S.C. § 405(g); *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]" *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) (internal quotation marks and citation omitted).  In analyzing whether substantial evidence supports the Commissioner's factual findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record.  *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986).  Even if the reviewing court would have decided the factual inquiry differently, it must defer to the ALJ and affirm the Commissioner's decision, so long as the decision is supported by substantial evidence.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Monsour*, 806 F.2d at 1190-91.

In addition to conducting an inquiry into whether substantial evidence supports the ALJ's determination, the Court must also review the ALJ's decision to determine whether the correct legal standards were applied.  *Bierley v. Barnhart*, 188 F. App'x 117, 119 (3d Cir. 2006).  The Court's review of legal issues is plenary.  *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000).

## III.   DISCUSSION

In resolving the instant motions, the Court will first address the relevant law regarding the disability determination process.  It will then go on to assess Plaintiff's arguments on appeal.

### A.   Disability Determination Process

Title II of the SSA "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability."  *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  Title XVI of the SSA provides for the payment of disability

12

benefits to indigent persons under the SSI program.  *Tate v. Berryhill*, C.A. No. 15-604-LPS, 2017 WL 1164525, at *5 (D. Del. Mar. 28, 2017).  To qualify for DIB benefits, the claimant must establish that she was disabled prior to the date she was last insured.  20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990).  A "disability" is defined for purposes of DIB and SSI as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 1382c(a)(3)(A) & 423(d)(1)(A); *see also Tate*, 2017 WL 1164525, at *5. A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]"  42 U.S.C. §§ 1382c(a)(3)(B) & 423(d)(2)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003); *Tate*, 2017 WL 1164525, at *5.

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis.  *See* 20 C.F.R §§ 404.1520 & 416.920; *see also Russo v. Astrue*, 421 F. App'x. 184, 188 (3d Cir. 2011).  If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further.  *See* 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i) (mandating a finding of non-disability when claimant is engaged in substantial gainful activity); 20 C.F.R. § 416.920(a)(4)(i) (same).  If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of

impairments that is severe.  20 C.F.R. § 404.1520(a)(4)(ii) (mandating a finding of non-disability

when claimant's impairments are not severe); 20 C.F.R. § 416.920(a)(4)(ii) (same).  If the

claimant's impairments are severe, then the Commissioner proceeds to step three and must

compare the claimant's impairments to a list of impairments (the "listings") that are presumed

severe enough to preclude any gainful work.  20 C.F.R. §§ 404.1520(a)(4)(iii) &

416.920(a)(4)(iii); *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).  When a claimant's

impairment meets or equals an impairment in the listings, the claimant is presumed disabled.  *See*

20 C.F.R. §§ 404.1520(a)(4)(iii) & 416.920(a)(4)(iii).  If a claimant's impairment fails to meet or

medically equal any listing, the Commissioner should proceed to steps four and five.  20 C.F.R.

§§ 404.1520(e) & 416.920(e).

At step four, the Commissioner determines whether the claimant retains the residual

functional capacity (or "RFC") to perform his or her past relevant work.  20 C.F.R. §

404.1520(a)(4)(iv) (stating that a claimant is not disabled if he or she is able to return to past

relevant work); 20 C.F.R. § 416.920(a)(4)(iv) (same); *Plummer*, 186 F.3d at 428.  A claimant's

RFC is "that which an individual is still able to do despite the limitations caused by his or her

impairment(s)."  *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 201 (3d Cir. 2008) (internal

quotation marks and citation omitted).  "The claimant bears the burden of demonstrating an

inability to return to [his or] her past relevant work."  *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to his or her past relevant work, step five requires the

Commissioner to determine whether the claimant's impairments preclude him or her from

adjusting to any other available work.  20 C.F.R. § 404.1520(a)(4)(v) & (g) (mandating a finding

of non-disability when the claimant can adjust to other work and a finding of disability when the

claimant cannot do so); 20 C.F.R. § 416.920(a)(4)(v) & (g) (same); *Plummer*, 186 F.3d at 428.

14

At this last step, the burden of production is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *Plummer*, 186 F.3d at 428. In other words, the ALJ must show that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with [his or] her medical impairments, age, education, past work experience, and [RFC]." *Id.* When making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *Id.* At this step, the ALJ often seeks the assistance of a VE (as the ALJ did here). *Id.*

### B.     Plaintiff's Arguments on Appeal

On appeal, Plaintiff presents two overarching arguments: (1) the ALJ erred in his severity findings at step two with regard to Plaintiff's right ankle/foot impairments, improperly concluding that those impairments were not severe when there was not substantial evidence to support that conclusion, (D.I. 17 at 12-15), and (2) the ALJ erred at steps four and five in making his RFC determination, in that the hypothetical question he posed to the VE and his RFC determination did not appropriately take into account certain of Plaintiff's limitations, including: (a) particular mental health-related limitations that were identified by two state agency medical consultants, and (b) the cumulative effects of Plaintiff's pain and mood disorder due to a physiological condition, (*id.* at 15-19). The Court will address these arguments in turn.

### 1.     Did the ALJ Err in Concluding that Plaintiff's Right Ankle/Foot Impairments Were Not Severe Impairments?

Plaintiff's first argument on appeal has to do with the ALJ's analysis at step two. Here, Plaintiff asserts that the ALJ erred at this step by not finding that Plaintiff's right ankle/foot impairments were severe impairments. (*Id.* at 12-15) For the reasons that follow, the Court agrees, and recommends that the case be remanded with respect to this issue.

As was noted above, at step two of the five-step sequential analysis, an ALJ considers whether a claimant's impairments are "severe." 20 C.F.R. §§ 404.1520(a)(4)(ii) & 416.920(a)(4)(ii). An ALJ may deem an impairment "not severe" only if it involves a "'slight abnormality'" that has "'no more than a minimal effect'" on the individual's ability to work. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004) (quoting Social Security Ruling 85-28, 1985 WL 56856, at *3). Conversely, an impairment is severe where it significantly limits the claimant's physical or mental ability to do "basic work activities," including, for example, physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling[.]" 20 C.F.R. §§ 404.1522(b) & 416.922(b). The United States Court of Appeals for the Third Circuit has described the severity determination at step two as "not an exacting one" for a claimant to meet, and as a "de minimis" inquiry. *McCrea*, 370 F.3d at 360 (internal quotation marks, emphasis and citations omitted). As a result, "[a]ny doubt as to whether this showing has been made is to be resolved in favor of the applicant[,]" *id.*, and a "Commissioner's determination to deny an applicant's request for benefits at step two should be reviewed with close scrutiny[,]" *id*.

Here, in assessing Plaintiff's right ankle/foot conditions at step two, the ALJ explicitly relied on only three medical records in concluding that the impairments were not severe. (Tr. at 18) First, the ALJ referenced an x-ray from May 15, 2017 (over a year after Plaintiff first sustained the injury), which "showed a healed fracture" of her heel bone. (*Id.* (citing *id.* at 556)) Second, the ALJ noted that Plaintiff then "returned to her orthop[]edic physician in July 2018 with complaints of right ankle pain, and it was recommended she walk with a cane and use some topical over-the-counter pain medications." (*Id.* (citing *id.* at 558)) Finally, the ALJ cited to

16

record of a June 4, 2019[4] appointment that Plaintiff had with her orthopedic specialist, Dr. Brady; the ALJ noted that in this record, it was reported that Plaintiff "had excellent range of motion on exam and there were no treatment recommendations[.]"  (*Id.* (citing *id.* at 1063-64)) The ALJ stopped his analysis there.

The ALJ's process at step two with regard to this condition amounted to error.  More specifically, the ALJ:  (1) committed legal error in failing to substantively consider certain of Plaintiff's medical records regarding her foot and ankle problems dating from between June 2019 and her August 2020 hearing, *see* 20 C.F.R. §§ 404.1520(a)(3) & 416.920(a)(3); and (2) issued a decision on severity that, in light of those records and other evidence, was not supported by substantial evidence.

Had the ALJ considered this additional evidence at step two—particularly the content of Dr. Grossinger's records regarding Plaintiff's ankle/foot conditions—he would have been required to grapple with a more complete picture of how those injuries appear to have worsened during that time.  (D.I. 24 at 3 (Plaintiff arguing that reversal is appropriate because the "ALJ did not address the complete treatment records of [Plaintiff's] orthopedic specialist and neurologist[.]"))  When one factors in the substance of this material, the Court does not see how Plaintiff's condition could not have been considered "severe," at least during the June 2019-August 2020 time period.

Taken together, the evidence from this period indicates that Plaintiff continued to have worsening pain and noticeable weakness associated with her right foot and ankle—symptoms

---

[4]     The ALJ described this appointment as occurring in "May 2019[,]" but it actually appears to have occurred on June 4, 2019.  (Tr. at 1063-64)

that caused her to walk with a noticeable limp and that significantly impacted her ability to stand and walk.  This evidence includes the following:

- Dr. Brady's June 2019 visit record:  The ALJ did consider this record at step two, but the Court notes that although Dr. Brady stated therein that no other treatments were recommended, he was referring specifically to *orthopedic surgery* treatments, not to other potential treatment options.  (Tr. at 1064 ("At this point I am not sure that there is any more *orthopedic surgery* that is necessary to make her better.") (emphasis added); *see also* D.I. 17 at 14)  In fact, after noting that no other orthopedic surgery options were recommended, Dr. Brady nevertheless referred Plaintiff to a neurologist to discuss a potential diagnosis of neuropathy and to "see if [the neurologist] can do something to help that [i.e., to 'make her better'.]"  (Tr. at 1064)  The reason why Dr. Brady was making this referral appears to be because, during that June 2019 visit, although Plaintiff had "excellent range of motion[,]" she had explained that overall, the problem with her foot and ankle was "worse[,]" that the pain she experienced was "shooting, sharp and piercing[,]" that her symptoms were "aggravated by standing and walking" and that although she had "great flexibility in the ankle" it was "painful[.]"

- Dr. Grossinger's November 12, 2019 visit record:  Plaintiff's first visit with her neurologist, Dr. Grossinger, resulted in the physician making objective findings related to Plaintiff's right foot and ankle pain.  For example, he reported that Plaintiff: (1) was "slow to arise from a chair and she walks with a limp favoring her right foot and ankle and her left hip"; (2) "has tenderness in her right foot and ankle"; (3) has "mild but definite weakness in the lower extremities"; and (4) has "decreased Achilles reflexes[.]"  (*Id.* at 1624-25)

- Dr. Grossinger's November 26, 2019 visit record:  At this visit, Dr. Grossinger ultimately diagnosed Plaintiff with RSD, along with allodynia and hyperpathia.  (*Id.* at 1615-16; *see also id.* at 1621 (noting that an EMG study was "indicative of moderate right S1 radiculopathy"))  Dr. Grossinger concluded by noting that he had "determined that [Plaintiff] is totally and permanently disabled from gainful employment . . . [because] [s]he could not even do a part-time sedentary job due to her inability to sit and her severe pain in the right foot."  (*Id.* at 1615)

18

- Dr. Grossinger's March 3, 2020 visit record:  In this visit, Dr. Grossinger continued to record objective findings of pain and limitations due to Plaintiff's foot and ankle problems.  This included noting that Plaintiff had an "antalgic" gait, (*id.* at 1613), and upon physical examination, had "weakness of the right foot and ankle with severe pain associated with touch over the right lower extremity[,]" (*id.*).

- Dr. Grossinger's September 2020 Medical Source Statement:  In this form, Dr. Grossinger concluded that Plaintiff could stand and walk for less than two hours in an eight-hour work day.  (*Id.* at 1629)[5]

- Plaintiff's Testimony:  During the August 2020 administrative hearing, Plaintiff explained how her foot and ankle problems had continued to worsen and how they currently impacted her ability to work.  When asked by the ALJ what symptoms she was then experiencing in her right foot and ankle, Plaintiff testified that she is in "constant pain" that is "excruciating when [she] step[s] down" and that she experiences a "constant burning around the outside part of the ankle" and a "constant . . . throbbing pain . . . on the inside part of the ankle."  (*Id.* at 47-48)  She also testified that the pain she feels affects how long she is able to stand and walk.  Specifically, she said she can only walk a short distance if she goes really slow, and that any uneven ground could potentially cause her to fall.  (*Id.* at 48-49, 59)  And as for standing, she explained that she cannot stand straight because standing "seems to put more pressure on that outside part [of her ankle] that sends [a] burning [sensation through her leg.]"  (*Id.* at 49)

These portions of the record seem particularly important here, in light of the ALJ's

conclusion that Plaintiff had the RFC to be able to perform "light work[.]"  (*Id.* at 19, 26-27)

---

[5]      In his decision, the ALJ did make reference to the November 12, 2019, November 26, 2019 and March 3, 2020 visits with Dr. Grossinger, but he did so only when directly assessing the issue of Plaintiff's neck and back pain.  (Tr. at 21-22)  And while in the RFC-related portion of his decision, the ALJ did note how Dr. Grossinger opined that Plaintiff could "stand/walk for less than 2 hours total" and could not perform any gainful employment, (*id.* at 25), there the ALJ never directly addressed the *substance* of Dr. Grossinger's treatment notes from these visits as they specifically related to Plaintiff's *foot and ankle pain and related limitations*.

Light work typically "requires a good deal of walking or standing[.]"  20 C.F.R. §§ 404.1567(b)

& 416.967(b).  And the evidence cited above suggests that, at least from June 2019 through

August 2020, Plaintiff's ability to walk and stand was pretty significantly compromised.

In light of the above, had the ALJ considered the content of Dr. Grossinger's records

regarding Plaintiff's ankle/foot impairments together with the other June 2019-August 2020

evidence on this score, Plaintiff should have met the "de minimis" step two hurdle necessary to

show that this condition then amounted to more than a "slight abnormality" (i.e., a severe

impairment).  And the Court cannot say that this error was harmless, as if the ALJ had also

considered this evidence at steps four and five, it seems possible that it might have meaningfully

altered the ultimate disability calculus.  *Rutherford*, 399 F.3d at 553 (noting that an ALJ's error

is harmless only if it "would not affect the outcome of the case").  Therefore, the Court finds that

remand is appropriate.  *See, e.g.*, *Rudy v. Berryhill*, Civil Action No. 3:16-CV-1687, 2017 WL

1283911, at *7-8 (M.D. Pa. Apr. 6, 2017) (holding that the ALJ erred at step two in concluding

that certain of the claimant's impairments were not severe, in part because the ALJ failed to

provide a "comprehensive longitudinal picture of the evidence"; instead, the ALJ had focused

on, *inter alia*, certain progress notes from June through September 2013 that showed the plaintiff

had stable blood pressure, without discussing later doctor's visits, medical exam records and

hospitalizations from November 2013 through May 2014, which documented significant

symptoms regarding headaches, cervicalgia, neck pain and back problems); *Snider v. Saul*, Civil

Action No. 19-1907-MN-SRF, 2021 WL 3090870, at *8 (D. Del. July 22, 2021) (concluding that

the ALJ's finding—i.e., that the claimant's depression, adjustment disorder and anxiety were not

severe at step two—was not supported by substantial evidence, where the ALJ had primarily

relied on 2016 opinions from state agency physicians in support of his decision, but had failed to

reference later-submitted evidence from 2016 through 2018 which was helpful to the plaintiff's case, or explain why he rejected such evidence), *report and recommendation adopted*, 2021 WL 3475676 (D. Del. Aug. 6, 2021).[6]

The Court notes that Defendant made only one contrary argument in an effort to combat Plaintiff's assertion of error here.  That is, Defendant argued that even if the ALJ had erred in not finding Plaintiff's foot and ankle impairments to be severe, such an error was harmless. Defendant claimed this was so because the ALJ nevertheless continued on past step two with the sequential evaluation process, and in so doing considered all of Plaintiff's relevant impairments, including "non-severe impairments" like her ankle/foot impairments, at the later steps of that process.  (D.I. 23 at 6-7); *see also Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007).  In support, Defendant pointed to various medical records that the ALJ considered at step four; these records generally note that Plaintiff had a normal gait and station, full range of motions in her joints, and had no gross motor or sensory deficits.  (D.I. 23 at 7)  In her brief, Defendant described these records as follows:

> 1. Mental health records [that] consistently mentioned [that Plaintiff had] normal gait and station (Tr. 21, referring to Tr. 585, 587, 589, 591, 593, 600, 604, 606, 609, 612, 615, 618, 621, 625, 627, 630, 633, 962, 965, 968, 971, 974, 977, 980, 983, 986, 989, 993, 997, 1001, 1005, 1010, 1013, 1018, 1021, 1025, 1605, 1609).

> 2. At a neurological examination on June 4, 2018, a physician observed that Plaintiff walked with a normal gait without ataxia and she had 5/5 strength in her extremities (Tr. 18, 21, referring to Tr. 543).

---

[6]     *See also Middlemas v. Astrue*, Civil Action No. 08-621, 2009 WL 578406, at *9 (W.D. Pa. Mar. 5, 2009) (noting that an ALJ may not "'pick and choose' among the evidence, selecting only that which supports his ultimate conclusions") (citation omitted).

> 3. On August 15, 2018, another medical source observed that
> Plaintiff had no gross motor or sensory deficits (Tr. 21, referring to
> Tr. 652).
>
> 4. On September 11, 2018, a medical source observed that Plaintiff
> walked with a normal gait and possessed normal muscle strength
> (Tr. 21, referring to Tr. 731).
>
> 5. On a rheumatological examination on June 22, 2019, Plaintiff
> was observed having diffuse extremity tender points, but full range
> of motion in all joints and no focal deficits (Tr. 21, referring to Tr.
> 1082).
>
> 6. On May 8, 2020, a chiropractor reported that Plaintiff was
> improving, reporting less discomfort, and showing improved
> function (Tr. 22, referring to Tr. 1359).

(D.I. 23 at 7)[7]

Defendant's argument fails to convince the Court that remand is unnecessary.  Most

significantly, this is so because of the over 40 different medical visits reflected in the above-

referenced records, only four of them date from the June 2019 through August 2020 time period

that the Court discusses above.  And the four cited records from that time period do not help

Defendant's case very much.  More specifically:

> - Two of the four records are from two of Plaintiff's visits to her
>   *mental health care* provider in July 2020.  These records note
>   (on one line of a four-page form, which covers innumerable
>   categories of data about Plaintiff's various past and current
>   physical and mental medical history)
>   "MUSCULOSKELETAL:  Normal gait."  (Tr. at 1605, 1609)
>   Although these brief notations could have some relevance to
>   Plaintiff's ability to stand and walk and to her ability to engage
>   in light work at the time, the fact that they derive from a
>   medical visit in which Plaintiff was seeking treatment for
>   mental-health problems (i.e., non-physical problems) would

---

[7]       The ALJ considered the vast majority of this evidence in the portion of his
decision in which he was assessing the impact of Plaintiff's "Cervical DDD and Obesity" on her
RFC.  (Tr. at 20-22)

seem to diminish their probative value.  Moreover, a notation that Plaintiff had a "normal gait" on a particular day does not necessarily speak to whether she could perform the *walking or standing demands of light work*.[8]

- The third record is from Plaintiff's July 2019 visit to a rheumatologist.  (*Id*. at 1082)  As the ALJ noted in his decision, these notes do indicate that the physician reported that Plaintiff had "no weakness, no difficulty walking, no numbness/tingling[,]" that she had free range of motion in all of her joints and that she had "no focal deficits[.]"  (*Id*. (*cited in id*. at 21))  But in that same visit, Plaintiff reported that her "right foot is particularly painful[.]"  (*Id*. at 1081)  This seems to jibe with what Dr. Brady noted during Plaintiff's June 2019 visit:  that while Plaintiff had a strong range of motion, she was nevertheless experiencing sharp pain in her foot.

- The last record is from a May 2020 visit that Plaintiff made to her *chiropractor*.  (*Id*. at 1359)  The record is entirely related to treatment of Plaintiff's neck and back pain, and has nothing to do with Plaintiff's ankle/foot-related ailments.  (*Id*.)

For all of these reasons, the Court recommends that the District Court grant this portion of Plaintiff's motion, and remand the case to the ALJ so that he can:  (1) review and discuss the content of Plaintiff's ankle/foot-related medical records from the June 2019 to August 2020 time period (particularly those of Dr. Grossinger); and (2) make a sufficient record as to whether or

---

[8]     *See Smith v. Saul*, CAUSE NO. 2:19-CV-496-TLS-JPK, 2021 WL 414583, at *4 (N.D. Ind. Jan. 14, 2021) (stating that the claimant's "reportedly normal gait does not by itself demonstrate an ability to stand and/or walk for six hours each workday as light work would require," and further noting that some courts have "repeatedly caution[ed] that a normal gait in a medical office does not establish the ability to stand or walk for six hours in a workday"); *Folck v. Colvin*, Case # 15-CV-711-FPG, 2016 WL 4746250, at *4 (W.D.N.Y. Sept. 13, 2016) (concluding that the ALJ's RFC determination was not supported by substantial evidence, in part because although "the ALJ repeatedly cite[d] to treatment notes [in his decision] stating that [the claimant] had a 'normal gait,' [] he did not explain how those findings indicate[d] that [the claimant] c[ould] perform the amount of walking necessary to engage in light work"); *Binford v. Colvin*, No. 14-cv-05339 JRC, 2014 WL 7338752, at *4 (W.D. Wash. Dec. 22, 2014) ("[T]he evidence cited by the ALJ, such as a normal gait and 5/5 strength, does not demonstrate that plaintiff had the capability to meet the sitting, standing, and walking demands of light work.").

not these conditions amounted to a severe impairment at step two (and whether or not related symptoms would impact the ALJ's disability assessment at steps four and five).

> ### 2. Did the Hypothetical Question Posed to the VE and the ALJ's Assessment of Plaintiff's RFC Include All of Plaintiff's Credibly Established Limitations?

Plaintiff's next set of arguments relates to the sufficiency of the ALJ's hypothetical question posed to the VE and the ALJ's determination of Plaintiff's RFC. Plaintiff asserts that the ALJ failed to include all of her credibly established limitations in the hypothetical question/RFC, including those relating to: (1) certain mental health-related limitations noted by state agency physicians, and (2) limitations regarding the cumulative effects of Plaintiff's pain and mood disorder.[9] The Court addresses both of these arguments below.

---

[9]         In making this challenge, Plaintiff also pointed to one additional reason why the ALJ's hypothetical question and RFC determination was erroneous: because the ALJ failed to reference "all the relevant medical evidence" in his opinion, including "chiropractic treatment notes which revealed persistent, chronic pain with reduced range of motion and muscle spasms" and an MRI of the cervical and lumbar spines which showed multiple herniated discs. (D.I. 17 at 19) Plaintiff's only (and very brief) argument as to why this was harmful error was that, had the ALJ specifically considered these records, he might have provided manipulative limitations related to Plaintiff's ability to reach, feel and finger. (*Id.*) The Court disposes of this issue briefly here, as Plaintiff's argument seems to conflate what an ALJ must consider with what an ALJ must discuss. While the ALJ is required to consider the relevant medical evidence, he is not required to discuss every piece of that evidence in his decision. *See Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). Here, the Court concludes that the ALJ adequately discussed Plaintiff's conditions as to her pain, muscle spasms, and back-related range of motion, citing to both positive and negative pieces of evidence. In that regard, the ALJ referenced, *inter alia*: (1) Plaintiff's testimony that she "sometimes drops things with the left hand, and has difficulty putting her hair up and driving[,]" (Tr. at 20); (2) her testimony that she "helps around the house, including loading the dishwasher [and] vacuuming[] and sweeping the floor," but that she needs to take breaks, (*id.*); (3) hospitalization records from March 2018, in which it was noted that Plaintiff had pain and weakness but also that "extensive workup and testing was unremarkable[,]" (*id.* at 23 (citing *id.* at 398-99, 449)); (4) an MRI of the cervical spine which showed trace progression of a tiny disc osteophyte complex at C7-T1, (*id.* (citing *id.* at 534)); (5) an EMG study showing mild left sided carpel tunnel syndrome, (*id.* (citing *id.* at 691)); (6) the fact that Plaintiff's treatment "has remained conservative in nature and limited to chiropractic care and pharmacotherapy[,]" (*id.* (citing *id.* at 1341-60, 1612-25)); and (7) that Plaintiff

24

a.      **Did the Hypothetical Question/RFC Include Appropriate**
         **Limitations Regarding Plaintiff's Mental Health Impairments?**

Plaintiff first faults the ALJ for finding the opinions of two state agency psychological

consultants—Dr. Patricia Miripol and Dr. Dianne Bingham (the "state agency physicians")—to

be persuasive, and yet failing to:  (1) incorporate several moderate mental health limitations

identified by those physicians into his hypothetical question or RFC or (2) provide an

explanation for the omission.  (D.I. 17 at 16-18)  Defendant did not directly respond to this

argument in its briefing.  (D.I. 23; *see also* D.I. 24 at 5 (Plaintiff correctly noting in her reply

brief that Defendant provided "no rebuttal response" as to this issue))[10]

The Third Circuit has stated that "a hypothetical question posed to a vocational expert

must reflect *all* of a claimant's impairments."  *Rutherford*, 399 F.3d at 554 (internal quotation

marks and citations omitted) (emphasis in original).  "Reliance on an expert's answer to a

hypothetical question will not constitute substantial evidence unless all credibly established

limitations are included; remand is required where the hypothetical question is deficient."

*Layfield v. Colvin*, Civil Action No. 15-358-SLR-SRF, 2016 WL 4578327, at *13 (D. Del. Sept.

1, 2016) (citing *Rutherford*, 399 F.3d at 554), *report and recommendation adopted* 2016 WL

5213902 (D. Del. Sept. 20, 2016).  Moreover, when "an ALJ accepts the opinion of the non-

---

experienced some improvement regarding her lower back pain and neck pain in May 2020, (*id.*
(citing *id.* at 1359)).  In light of this, the Court can discern no error with how the ALJ treated this
evidence, nor with the conclusions he drew therefrom.  *See, e.g.*, *Dease v. Saul*, CIVIL ACTION
NO. 18-5106, 2020 WL 1531522, at *10 (E.D. Pa. Mar. 31, 2020) (rejecting the claimant's
argument that the ALJ erred in failing to consider certain medical records relating to the
claimant's cardiovascular impairments, where the ALJ overall discussed and weighed both
positive and negative findings from the medical records regarding those same impairments).

[10]      Defendant's failure to do so, after Plaintiff had articulated the issue in some detail
in her opening brief, reads essentially as a concession of harmful error.

25

examining state agency physician, the ALJ is required to include the functional limitations identified by that source in the RFC finding and hypothetical question," *Alley v. Astrue*, 862 F. Supp. 2d 352, 365 (D. Del. 2012) (citing *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004)); *see also Bowers v. Astrue*, Civil Action No. 10-622-RGA, 2012 WL 3150392, at *4 (D. Del. Aug. 2, 2012) (same) (citing *Ramirez*), or at a minimum must at least explain (or cite to evidence that makes clear) why he did not do so, *see Wilkinson v. Comm'r of Soc. Sec.*, 558 F. App'x 254, 256 (3d Cir. 2014).

As noted above, Dr. Miripol and Dr. Bingham opined on the limitations imposed by Plaintiff's mental health conditions.  First, in a September 25, 2018 opinion, Dr. Miripol concluded, *inter alia*, that Plaintiff had moderate limitations in the following mental health areas:

> (1) [t]he ability to understand and remember detailed instructions[,]
>
> (2) [t]he ability to carry out detailed instructions[,]
>
> (3) [t]he ability to maintain attention and concentration for extended periods[,]
>
> (4) [t]he ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances[,]
>
> (5) [t]he ability to complete a normal workday and workweek without interruptions from psychologically[-]based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods[,]
>
> (6) [t]he ability to accept instructions and respond appropriately to criticism from supervisors[,]
>
> (7) [t]he ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes[, and]

(8) [t]he ability to set realistic goals or make plans independently
of others.[11]

(Tr. at 79-80)  On March 12, 2019, Dr. Bingham affirmed Dr. Miripol's findings, concluding that

there were no significant changes in Plaintiff's mental health condition since Dr. Miripol's initial

assessment.  (*Id.* at 84)

The ALJ found these state agency physicians' opinions to be persuasive.  In doing so, he

noted that the "medical findings are supported by explanation[] and are consistent with mental

health treatment recordings documenting relatively stable symptoms despite periods of increased

stress[.]"  (*Id.* at 24)  Despite this conclusion, however, the ALJ included only three mental-

health related limitations in the hypothetical question and the RFC.  Specifically, the ALJ

concluded that Plaintiff had the RFC to:  (1) remember, understand and carry out simple

instructions, (2) tolerate occasional changes in the workplace, and (3) tolerate occasional

interaction with supervisors.  (*Id.* at 19-20)

On appeal, Plaintiff does not dispute that the RFC accounted for Limitation Nos. 1, 2, or

6.  (D.I. 17 at 17)  But Plaintiff asserts that the RFC does not adequately convey the remaining

moderate limitations (or that if the ALJ rejected inclusion of those additional limitations, then it

is not clear why he did so).  The Court agrees, and concludes that this error too requires remand.

This is easiest to see regarding Limitation Nos. 3-5, and so the Court will focus on those here.

With respect to Limitation No. 3 (Plaintiff's ability to maintain attention and

concentration for extended periods of time) and Limitation No. 5 (her ability to complete a

normal workday or work week without interruptions from psychologically based symptoms, and

---

[11]      In its analysis, the Court will refer to these limitations as "Limitation No. __[,]"
depending on the corresponding bullet point number of the limitation.

to perform at a consistent pace without an unreasonable number and length of rest periods), the
ALJ does not appear to have included such pace-related limitations in his hypothetical
question/RFC or provided any explanation for the omission.  This error could not be harmless
because, as Plaintiff notes, (D.I. 17 at 18), the VE testified that an individual who exhibited 11%
or more of off-task behavior would not be able to perform substantial gainful employment, (Tr.
at 63).

      In reviewing the ALJ's analysis, it might be that the ALJ believed that Plaintiff's pace-
related limitations were encompassed by the "can remember, understand and carry out simple
instructions" limitation.  (*Id*. at 19-20)  However, courts have repeatedly found that inclusion of
such "simple instructions" or "simple, routine, repetitive work"-type limitations do not
necessarily encompass a claimant's deficiencies in concentration and in maintaining a consistent
pace.  *See, e.g.*, *Watson v. Saul*, C.A. No. 18-880 (MN), 2020 WL 2737012, at *11 (D. Del. May
26, 2020) (concluding that the ALJ's hypothetical, which limited Plaintiff to "simple, routine,
repetitive work," did not adequately address the claimant's "moderate limitations in terms of
concentration, persistence, or pace[]").[12]  As the Third Circuit has explained, "[m]any employers
require a certain output level from their employees over a given amount of time, and an
individual with deficiencies in pace might be able to perform simple tasks, but not over an
extended period of time."  *Ramirez*, 372 F.3d at 554.  Thus, to the extent the ALJ believed the
limitation to simple tasks adequately addressed Plaintiff's pace-related limitations, the ALJ did
not explain why this is so.  Nor did the ALJ provide any other explanation for omitting

---

[12]     *See also Persinger v. Comm'r of Soc. Sec.*, Case No. 6:15-cv-1377-Orl-DAB,
2016 WL 4063373, at *5-7 (M.D. Fla. July 29, 2016); *Gandy v. Barnhart*, No. 04 C 0600, 2004
WL 2481001, at *9 (N.D. Ill. Nov. 3, 2004).

limitations related to pace from the hypothetical question/RFC (and the Court cannot discern any).  Since inclusion of pace-related limitations might have affected the ultimate disability determination, the Court cannot say that such an omission was harmless.

Similarly, with respect to Limitation No. 4 (Plaintiff's limitation in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances), the Court again concludes that it was error for the ALJ to not incorporate this into his hypothetical question/RFC, or provide an adequate explanation for the omission.  And again, this error cannot be harmless, since the VE testified that an individual who missed just two days per month would be precluded from work.  (Tr. at 63)  Although the ALJ need not include limitations in a hypothetical question/RFC that are unsupported by the record (so long as he adequately explains why he feels that this is so), *see Rae v. Berryhill*, Civil Action No. 17-967, 2018 WL 3619247, at *4 (W.D. Pa. July 30, 2018), here again, the ALJ seems to have agreed with the state agency physicians that the limitations they proposed *were* so supported, (Tr. at 24).  So the Court cannot divine any potential reason for the omission, and remand is necessary as to this issue.  *See Audrey K. v. Kijakazi*, Case No. 2:19-cv-20020, 2021 WL 4170042,  at *7 (D.N.J. Sept. 13, 2021).[13]

---

[13]        The other two limitations at issue are Limitation No. 7 (the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes), and Limitation No. 8 (the ability to set realistic goals or make plans independently of others).  It is a little more challenging for the Court to determine whether any error in failing to incorporate these limitations into the hypothetical question and the RFC determination would have been harmless—in part because the Plaintiff said very little about them in her briefing, (D.I. 17 at 18), and (as noted above) Defendant said nothing at all.  In any event, because remand is suggested for the ALJ to address at least Limitation Nos. 3-5, in an abundance of caution, the ALJ should also address Limitation Nos. 7-8, explaining why the limitations should or should not be accounted for in the hypothetical question and in Plaintiff's RFC.

For the reasons set forth above, the Court recommends that Plaintiff's motion be granted on this basis as well, and that on remand, the ALJ address Limitation Nos. 3-5 (as well as Limitation Nos. 7-8 in an abundance of caution) in his disability analysis.

> **b.**     **Did the ALJ Fairly Assess the Cumulative Effects of Plaintiff's Pain and Mood Disorder?**

Plaintiff's final argument is that the ALJ failed to include in his RFC determination limitations resulting from the cumulative effect of Plaintiff's severe pain and mood disorder due to a physiological condition. (D.I. 17 at 18-19) Specifically, Plaintiff asserts that the ALJ did not consider how "[t]he cumulative effect of those limitations would affect her ability to sustain mental activities needed for work." (*Id.* at 18) For the reasons that follow, the Court concludes that the ALJ did not err in this regard.

In making this argument, Plaintiff's chief complaint seems to be that the ALJ did not consider the treatment records of Wright, Plaintiff's therapist, who diagnosed Plaintiff with the mood disorder. (D.I. 17 at 18-19) For instance, in her briefing, Plaintiff points to several of Wright's treatment records, which note Plaintiff stating that her pain was impacting her everyday life. (*Id.* (citing Tr. at 1480, 1520, 1524, 1528, 1532, 1568, 1592)) Plaintiff asserts that the ALJ should have discussed these records in his decision but did not. (*Id.* at 19 ("The ALJ in his decision failed to discuss 17 months of documented mental health treatment and findings from March 2019 to June 2020 as well as [Wright's] diagnosis of a mood disorder."))

The Court rejects this argument. Even if the ALJ did not explicitly cite to these specific records,[14] it is clear that the ALJ did, in fact, consider the combined effect of Plaintiff's pain on

---

[14]     Again, the ALJ need not specifically cite to or discuss every piece of evidence in the record, so long as it is clear that he considered the relevant record evidence as a whole in coming to his decision. *See, e.g.*, *Dease*, 2020 WL 1531522, at *9-10 (citing cases).

her mental abilities.  Having done so, he nevertheless rejected the incorporation of a related limitation.

For example, in his decision, the ALJ assessed a July 31, 2020 "Mental Impairment Questionnaire" completed by Wright.  In that questionnaire, Wright opined, *inter alia*, that Plaintiff's "fluctuating anxiety[ and] depressed mood [] is exacerbated by physical pain[.]"  (Tr. at 1414)  In answering the question whether Plaintiff's "psychiatric condition exacerbates [her] experience of pain or any other physical symptom[,]" Wright wrote, "Yes[,]" explaining that Plaintiff's "chronic pain increases stress response and frustration intolerance, as well impacting [her] energy level, focus [and ability to] sustain[] concentration."  (*Id.* at 1417)  Based on the connection between Plaintiff's pain and her mental abilities, Wright concluded that Plaintiff had certain mental limitations that Wright referred to as both "moderate" and "marked":  specifically Plaintiff's ability to "[c]oncentrate, persist, or maintain pace" and "[a]dapt or manage oneself[.]" (*Id.* at 1418)

In considering Wright's opinion, the ALJ explicitly noted how Wright had opined on the interconnection between Plaintiff's pain and her mental abilities.  (*Id.* at 24-25 (noting that Wright had stated that "the claimant's chronic pain increases her stress response and frustration intolerance"))  Ultimately, however, the ALJ rejected the "serious and marked" limitations imposed by Wright, concluding that Plaintiff's mental health records did not support such a finding.  In so doing, the ALJ cited to Plaintiff's April 2018 and July 2020 treatment records with Wright, in which Wright noted that Plaintiff had an anxious and depressed mood and was sad or gloomy, but also that Plaintiff's mental status exam was largely stable and normal.  (*Id.* at 25 (citing *id.* at 585-86, 1608-10); *see also* D.I. 23 at 4-5, 9)  Additionally, the ALJ also remarked that the "serious and marked" limitations suggested by Wright were inconsistent with

31

the prior administrative medical findings of Dr. Miripol and Dr. Bingham, who had concluded that Plaintiff had only "moderate" limitations.  (Tr. at 25)

Given the ALJ's analysis, the Court cannot agree with Plaintiff that the ALJ failed to consider how her "mental health and pain heightened impacting her ability to function."  (D.I. 17 at 19)  The ALJ did consider that issue, as well as Wright's treatment records and opinions on that subject.  He simply rejected Wright's suggestion that certain additional serious and marked limitations should be included in Plaintiff's RFC.  And while the Court may not have necessarily come to the same conclusion as the ALJ did on this subject were it reviewing the matter *de novo*, that is not the Court's role here.  The question is whether substantial evidence (i.e., "more than a mere scintilla of evidence") supports the ALJ's decision in this regard.  The ALJ's citations to the content of certain of Wright's medical records noted above, as well as to the opinions of the state agency physicians, at least met that low bar.  Thus, the Court recommends that Plaintiff's motion be denied in this regard.

## IV.    CONCLUSION

For the reasons set forth in this Report and Recommendation, the Court recommends that the District Court GRANT-IN-PART and DENY-IN-PART Plaintiff's motion and GRANT-IN-PART and DENY-IN-PART Defendant's motion.  It also recommends that the case be remanded for further proceedings as set out herein.[15]

---

[15]    Although Plaintiff requested that the Court reverse the Commissioner's decision and award benefits to Plaintiff, (D.I. 17 at 20), the Court does not recommend that course here. A court may reverse an ALJ's decision and grant disability benefits when the record has been fully developed, all essential factual issues have been resolved, and the record adequately establishes a claimant's entitlement to benefits. *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000). Here, the record is substantial, but the Court does not believe that this is a case where it is now necessarily clear that an award of benefits is required. That could be the case. But it also could be that if the ALJ assesses the evidence and the limitations referenced herein, he may be

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.


Dated:  July 31, 2023

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

---

able to sufficiently explain why no finding of disability is appropriate.  *See, e.g.*, *Morris v. Astrue*, Civ. Action No. 10-414-LPS-CJB, 2012 WL 769479, at *25 (D. Del. Mar. 9, 2012).

33